**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| JERRY BALDRIDGE, individually, and on behalf of all others similarly situated, | )<br>)<br>) |
| Plaintiff, | )<br>) Case No.: 4:23-cv-04309 |
| v. | )<br>) **JURY TRIAL DEMANDED** |
| GREAT WESTERN INSURANCE COMPANY, | )<br>) |
| Serve registered agent at:<br>601 6th Avenue<br>Des Moines, Iowa 50309 | )<br>)<br>)<br>) |
| Defendant. | ) |

## CLASS ACTION COMPLAINT

COMES NOW Plaintiff Jerry Baldridge, individually, and on behalf of all others similarly situated, and through his counsel of record, submits his Complaint against Defendant Great Western Insurance Company, and states:

### INTRODUCTION AND BACKGROUND ON THE TCPA

1. Plaintiff Jerry Baldridge ("Plaintiff" or "Baldridge"), brings this case to protect his privacy rights, namely the right to be left alone from unwanted telemarketing phone calls.

2. Baldridge brings this suit to get telemarketers like Great Western Insurance Company ("Defendant" or "GWIC"), to stop incessantly calling his phone and the putative class members' phones despite the fact Plaintiff and the putative class members: 1) did not provide prior express consent to be called by GWIC to receive prerecorded or artificial voice calls; and, 2) registered their phones number on the National Do-Not-Call Registry ("DNC List").

3. In 1991, after passage with bipartisan support in Congress, President George H.W. Bush signed the Telephone Consumer Protection Act ("TCPA") into law, to protect consumers' consumers' privacy rights, namely, the right to be left alone from unwanted telemarketing calls. A leading sponsor of the TCPA described unwanted telemarketing calls as "the scourge of modern civilization." 137 Cong. Rec. 30821 (1991).

4. The TCPA provides protections from people receiving prerecorded or artificial voice calls, which are commonly referred to as robocalls and are referred to as robocalls throughout this Complaint. Specifically, the TCPA provides that each person who receives a prerecorded or artificial voice call without first obtaining the recipient's "prior express written consent" is entitled to recover a penalty of $500 per call, and up to $1,500 per call if the TCPA is willfully or knowingly violated. *See* 47 U.S.C. § 227(b)(1)(A); 47 C.F.R. § 64.1200(a)

5. The TCPA also affords special protections for people who registered their phone numbers on the National Do Not Call Registry. Specifically, the TCPA provides that each person who receives more than one call on their phone after being registered on the National Do Not Call Registry is entitled to recover a penalty of up to $500 per call, and up to $1,500 per call if the TCPA is willfully or knowingly violated. *See* 47 U.S.C. § 227(b)(1)(A); 47 U.S.C. § 227(b)(1)(3); 47 C.F.R. § 64.1200(a).

6. The TCPA also affords special protections for people who registered their phone numbers on the National Do Not Call Registry. Specifically, the TCPA provides that each person who receives more than one call on their phone after being registered on the National Do Not Call Registry is entitled to recover a penalty of $500 per call, and up to $1,500 per call if the TCPA is willfully or knowingly violated. 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2).

7. Since 2003, persons who register their cell phone numbers on the DNC List are considered to be "residential subscribers" for the purpose of 227(c)(5) and the DNC List. *In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14039 (2003) ("we will presume wireless subscribers who ask to be put on the national do-not-call list to be 'residential subscribers.'")

8. From January 2023 until October 2023, approximately 46.7 billion robocalls were placed in the United States. RobocallIndex.com, YouMail Robocall Index, https://robocallindex.com/history/time (last visited Nov. 14, 2023).

9. Decades after the TCPA passed into law, it is still unfortunately the case that "month after month, unwanted telemarketing calls and texts top the list of consumer complaints received by the [Federal Communications] Commission." *Omnibus TCPA Order*, 30 FCC Rcd. 7961, 7964 (F.C.C. July 10, 2015).

10. In fact, in 2021 alone, there were over five million do-not-call complaints to the FTC about unwanted telemarketing calls. Federal Trade Commission, *FTC Issues Biennial Report to Congress on the National Do Not Call Registry* (Jan. 5, 2022) *available at*: https://www.ftc.gov/news-events/news/press-releases/2022/01/ftc-issues-biennial-report-congress-national-do-not-call-registry (last visited Aug. 1, 2023).

11. The private right of enforcement of the TCPA is critical to stopping the proliferation of these unwanted telemarketing calls. For example, while the Federal Communications Commission levied over $200 million in penalties against telemarketers between 2015 and 2018, it collected less than $7,000 of that amount. *See* Sarah Krouse, *The FCC Has Fined Robocallers $208 Million. It's Collected $6,790*, THE WALL STREET JOURNAL, March 28, 2019,

https://www.wsj.com/articles/the-fcc-has-fined-robocallers-208-million-its-collected-6-790-11553770803.

## JURISDICTION AND VENUE

12. This Court has subject-matter jurisdiction over the TCPA claims in this action under 28 U.S.C. § 1331, which grants this court original jurisdiction of all civil actions arising under the laws of the United States.

13. This Court has personal jurisdiction over Defendant because Defendant transacts business in Texas, places telemarketing phone calls to persons in Texas (like Baldridge) and sells various insurance-related products and services to persons in Texas.

14. Defendant knowingly and purposefully availed itself to Texas by calling Baldridge at his "254" area code, which is associated with the State of Texas.

15. Upon information and belief, Defendant's website allows a user to select the State of Texas to view the various products available to persons located in Texas.

16. Defendant's website offers to sell "final expense insurance" and other types of insurance products to persons located in the State of Texas.

17. Plaintiff is and at all times relevant was, a resident of Montgomery, Texas, which is within this District.

18. Plaintiff experienced the annoyance, frustration, and disruption from Defendant's telemarketing calls while present in this District.

19. Venue is proper under 28 U.S.C. §§ 1391(b)(2) as a substantial portion of the events giving rise to the claim arose in this District.

## PARTIES

20. Baldridge is an individual who at all times material to this Complaint resided in and was a citizen of the Montgomery, Texas.

21. Baldridge is the owner of a cell phone. His cell phone number is 254-XXX-0022.

22. Baldridge registered his phone number on the DNC List on or about January 2, 2006 to obtain solitude from unwanted telemarketing calls.

23. Baldridge's cell phone number is a personal phone number and is not a business line.

24. The monthly bill associated with Baldridge's phone number is issued in Baldridge's name, and not in the name of a business.

25. Baldridge uses his cell phone primarily for residential purposes, such as communicating with friends and family members.

26. GWIC is an Iowa corporation that is headquartered in the State of Iowa. GWIC has been in good standing to transact business at all times relevant to this Complaint.

27. GWIC transacts business in the State of Texas and throughout the United States.

28. GWIC sells a variety of insurance products, including "final expense insurance."

29. Final expense insurance is insurance that assists with various end-of-life costs, including funeral expenses or cremation services.

30. GWIC markets its insurance products through a variety of marketing tactics including placing telemarketing robocalls.

## GWIC'S TELEMARKETING

31. On December 7, 2022, Baldridge received a phone call on his cell phone from GWIC or someone acting on GWIC's behalf.

32. The phone number that appeared on Baldridge's caller ID was a phone number with an Iowa area code.

33. Baldridge answered the phone and heard a "bloop" noise. As the line was silent, Baldridge said "hello" multiple times.

34. Rather than a live person responding, GWIC responded with "soundboard" prerecorded voice technology software - voice technology is where pre-recorded or computer-generated audio clips are played in response to human prompts to create the impression the consumer is communicating with a live person.

35. The voice technology responded to Baldridge's greeting: "Hello. This is Patricia. I am calling from 'Senior Benefits.' How are you?"

36. The "voice" on the line was computerized and non-interactive. From the cadence, tone, and presentation of the voice in the call, Baldridge could ascertain that "Patricia" was not a live person, but rather software playing pre-recorded or artificially generated clips.

37. Baldridge responded to the artificial voice by stating, "I'm good." The automated voice then responded, "The reason of my call is to qualify you for a new low-cost final expense updated plan from which you can get some extra coverage and extra benefits."

38. The artificial voice then asked Baldridge a series of questions in an automated manner, including asking for Baldridge's age.

39. So as to determine who was improperly calling him as the name "Senior Benefits" did not identify the company calling, Baldridge answered the questions from the automated voice.

40. The artificial voice then stated it was bringing a "verification officer" on the line to guide Baldridge further.

41. The introduction of a live officer in contrast with the voice on the line at the outset of the call further confirms the voice at the outset was soundboard technology, rather than a live person.

42. After the call was transferred, Baldridge then heard another "bloop" and was connected with a live person who identified himself as "Mike" who described himself as a "final expense specialist" with "Senior Care."

43. "Mike" then proceeded to advise he was selling including insurance that would cover funeral expenses and other death benefits.

44. On December 8, 2022, Baldridge received a phone call on his cell phone from GWIC or someone acting on GWIC's behalf.

45. The phone number that appeared on Baldridge's caller ID was yet another phone number with an Iowa area code.

46. Baldridge answered the phone and heard a "bloop" noise. As the line was silent, Baldridge said "hello" multiple times.

47. The automated voice again stated, "The reason of my call is to qualify you for a new low-cost final expense updated plan from which you can get some extra coverage and extra benefits."

48. The artificial voice then asked Baldridge a series of questions in an automated manner.

49. So as to determine who was improperly calling him as the name "Senior Benefits" did not identify the company calling, Baldridge answered the questions from the automated voice.

50. The artificial voice then stated it was bringing a "verification officer" on the line to guide Baldridge further.

51. Baldridge then heard another "bloop" and was connected with a live person who again identified himself as "Mike" who described himself as a "final expense specialist" with "Senior Care."

52. "Mike" then proceeded to advise he was selling including insurance that would cover funeral expenses and other death benefits.

53. Baldridge conversed with "Mike" to determine who was placing the unwanted calls.

54. "Mike" then transferred the call to person who identified themselves as "Samuel Lee" at which point the call dropped.

55. "Samuel Lee" then called Baldridge back about ten minutes later.

56. Baldridge continued speaking with "Samuel Lee" to determine who was placing him unwanted calls. "Samuel Lee," in the middle of the call, then changed his name to "Harry Anderson."

57. In that conversation, "Harry Anderson" disclosed many minutes into the call that Baldridge's insurance company would be "Great Western" who "would be ready to insure him right away." The call dropped shortly thereafter.

58. Baldridge then received another call shortly after the drop in which the representative began to provide information about "Great Western."

59. Baldridge then obtained a GWIC policy from the caller and obtained a policy number for the purpose of confirming that GWIC was the company actually calling him. The representative then stated that "Great Western" would e-mail the policy documents.

60. In this suit, Baldridge only seeks recourse from GWIC for the call placed on December 7, 2022, and the first call placed on December 8, 2022.

61. Prior to those calls, Baldridge did not provide prior express written consent to GWIC or anyone acting on his behalf to call his cell phone.

62. Baldridge did not provide his phone number to GWIC or anyone acting on its behalf.

63. Baldridge had no prior business relationship with GWIC before receiving the calls at issue.

64. Baldridge never inquired of GWIC about any of its products or services before he received the calls at issue.

65. Baldridge was not in the market for final expense insurance at the time he received the calls at issue.

66. On information and belief, the persons who called Plaintiff and the putative class members used generic names to make it difficult for the recipient of GWIC's telemarketing calls to determine GWIC or someone acting on its behalf was placing the unwanted telemarketing calls.

67. On information and belief, GWIC or someone acting on its behalf placed prerecorded voice calls to hundreds if not thousands of persons (*i.e.* putative class members) without first obtaining said persons' "prior express written consent" to receive such calls.

68. On information and belief, GWIC or someone acting on its behalf placed prerecorded voice calls to hundreds if not thousands of persons (*i.e.* putative class members) without first obtaining said persons' "prior express written consent" to receive such calls.

69. GWIC's conduct of calling Plaintiff and the putative class members privacy rights as they were subjected to annoying and harassing calls.

70. GWIC's conduct of calling Plaintiff and the putative class members intruded upon Plaintiff's and the putative class members' right to be left alone, and their interest of seclusion.

## DIRECT AND VICARIOUS LIABILITY

71. Without the benefit of discovery, because GWIC disclosed its identity, Plaintiff assumes GWIC directly placed the calls.

72. However, if discovery reveals that some or all of the calls were made by third-party/parties on behalf of GWIC, then GWIC is vicariously liable for those calls.

73. On May 9, 2013, the FCC determined that this was not a basis for avoiding liability within a Declaratory Ruling that held that sellers may not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside of the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain relief. As the FTC noted, because "[s]ellers may have thousands of "independent" marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy.

*In re: Dish Network, LLC,* 28 F.C.C. Rcd. 6574 at 6588 (May 9, 2013) (internal citations omitted).

74. Moreover, the May 2013 FCC ruling rejected a narrow view of TCPA liability, including the assertion that a seller's liability requires a finding of formal actual agency and immediate direction and control over third parties who place a telemarketing call. *Id*. at 6587 n. 107.

75. The evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.,* at 6593.

76. If GWIC directly placed the calls at issue to Baldridge, GWIC is directly liable for those calls.

77. However, GWIC may have hired, encouraged, permitted, and enjoyed the benefits of mass telemarketing by third-party telemarketers that are currently unknown to Plaintiff and only known to GWIC.

78. In the event, GWIC's third-party telemarketers had actual and/or apparent authority to act on behalf of GWIC.

79. Likewise, GWIC also ratified its agents' violations of the TCPA by accepting leads and deriving profit from sales imitated by unlawful robocalls.

80. GWIC controlled or had the right to control the marketing activities of those acting on its behalf. Among other things, the calls received from Baldridge were similar in that they used a similar artificial voice script which asked similar questions and used similar generic names.

81. GWIC acted as a principal to telemarketing agent(s) whose identity or identities are unknown at this time.

82. GWIC is not permitted under the law to outsource and contract its way out of liability by directing and benefitting from its agents' TCPA violations.

83. For the counts identified below, if GWIC directly placed the call(s), it is directly liable. In the alternative, to the extent any call(s) were made by a third-party agent(s) acting on GWIC's behalf, GWIC is vicariously liable for those unlawful calls.

## Class Allegations

84. Pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3), Plaintiff brings this lawsuit as a class action on himself and all others similarly situated. This action satisfies the requirements of Rule 23.

85. Plaintiff seeks to represent the following classes:

**Prerecorded Voice Class:** All persons in the United States who from four years prior to the filing of this action through class certification to whom GWIC or someone acting on its behalf utilizing a pre-recorded or artificial voice call, to the recipient's phone.

**DNC List Class:** All persons in the United States who from four years prior to the date of the filing of this lawsuit until the date of class certification: (1) to whom GWIC (or someone acting on its behalf) placed two or more calls during a 12-month period; (2) where the calls were made in connection with a campaign to solicit GWIC's products or services; and, (3) whose number was registered on the Do Not Call Registry for more than 30 days at the time the calls were received; (4) where the phone number is registered to an individual, rather than a business.

86. Plaintiff reserves the right to add administrative subclasses, or to amend the definition of the proposed class, during the lawsuit proceedings.

87. The members of the proposed classes are so numerous that joinder of all members is impracticable. Plaintiff reasonably believes that hundreds or thousands of people have been harmed by GWIC's actions. The phone numbers of the members of the proposed class are readily identifiable through records available to GWIC or those acting on its behalf.

88. Most members of the proposed class have suffered damages in an amount such that it would make filing separate lawsuits by individual members economically infeasible.

89. On information and belief, GWIC has called and continues to call people using artificial or prerecorded voice calls without first obtaining the recipient's prior express written consent and will continue to place telemarketing calls to persons whose numbers are registered on

the DNC List. It is reasonable to expect that GWIC will continue to send such text messages absent this lawsuit.

90. Common questions of law and fact exist as to all members of the proposed class and predominate over any questions affecting only individual members. The questions of law and fact common to the proposed class include, but are not limited to:

    a. Whether the voice technology used by GWIC or on its behalf constitutes a "pre-recorded voice" as defined by 47 U.S.C. § 227(b);

    b. Whether GWIC exercised valid methods of obtaining express written consent before making calls to consumers;

    c. If GWIC did not directly place the calls at issue, whether an agency relationship exists between GWIC and its telemarketing vendor(s);

    d. Whether GWIC ratified the conduct of vendor(s)/agent(s);

    e. Whether GWIC or someone acting on its behalf placed prerecorded voice calls to Plaintiff and the putative class members without the appropriate form of consent;

    f. Whether GWIC or someone acting on its behalf placed prerecorded voice calls to Plaintiff and the putative class members without the appropriate form of consent;

    g. Whether GWIC's conduct violates 47 U.S.C. § 227(b);

    h. Whether GWIC's conduct violates 47 U.S.C. § 227(c);

    i. Whether GWIC's conduct violates the rules and regulations implementing the TCPA; and,

    j. Whether Plaintiff and the putative class members are entitled to increased damages for each violation based on the willfulness of GWIC's conduct.

91. Plaintiff's claims are typical of the claims of the proposed class members because their claims arise from the same practice that gives rise to the claims of the members of the proposed class and are based on the same legal theories.

92. Plaintiff and his counsel will fairly and adequately protect the interests of the members of the proposed class. Plaintiff's interests do not conflict with the interests of the proposed classes they seek to represent. Plaintiff has retained lawyers who are competent and experienced in class action litigation, TCPA litigation and consumer law.

93. Plaintiff's counsel will vigorously litigate this case as a class action, and Plaintiff and his counsel are aware of their responsibilities to the putative members of the class and will discharge those duties.

94. A class action is superior to all individual lawsuits for this controversy. Joinder of all proposed members of the proposed class in one action is impracticable if not impossible and prosecuting hundreds or thousands of individual actions is not feasible. The size of the individual claims is likely not large enough to justify filing a separate action for each claim. For many, if not most, members of the proposed class, a class action is the only procedural mechanism that will allow recovery. Even if members of the proposed class had the resources to pursue individual litigation, that method would be unduly burdensome to the courts. Individual litigation could also result in inconsistent adjudications.

95. In contrast, a class action is superior in that it will benefit the court and litigating parties through efficiency, economy of scale and unitary adjudication resulting from supervision of the litigation by a single court.

96. Questions of law and fact, particularly the propriety of placing prerecorded voice calls without first obtaining prior express written consent and calling phone numbers on the DNC List, predominate over questions affecting only individual members.

97. GWIC has acted or refused to act on grounds that apply generally to the class, making final injunctive relief or corresponding declaratory relief is appropriate with respect to the class as a whole.

## Count I - Violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(b) *et seq.* (Artificial or Prerecorded Voice Calls)

98. Plaintiff incorporates by reference the allegations of the previous paragraphs as if fully stated in this count.

99. The TCPA provides, in part:

> It shall be unlawful . . . (A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using [a] prerecorded voice . . . (iii) to any telephone number assigned to a . . . cellular telephone . . . .

47 U.S.C. § 227(b)(1)(A)(iii).

100. The TCPA also prohibits calls using an artificial or pre-recorded voice to "any residential telephone line" without prior express written consent. 47 U.S.C. § 227(b)(1)(B).

101. The TCPA defines a "telephone solicitation" as a "call or message for the purpose of encouraging the purchase of goods, or services which is transmitted to any person." 47 U.S.C. § 227(a)(4).

102. The Federal Communications Commission's regulations implementing the TCPA provide that telephone solicitations cannot be made to a recipient without the recipient's "prior express written consent." *See* FCC 12-21, CG Docket 02-278 (effective October 16, 2013); 47 C.F.R. § 64.1200(a)(2)

103. The term "prior express written consent" as defined by the Code of Federal Regulations means "an agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered." 47 C.F.R. § 64.1200(f)(8)(i).

104. The TCPA provides for a private right of action and statutory damages of $500 per violation, and up to $1,500.00 per violation. 47 U.S.C. § 227(b)(3).

105. In addition, the TCPA allows the Court to enjoin GWIC's violations of the TCPA of placing prerecorded or artificial voice calls without first obtaining prior express written consent to place such calls. *See* 47 U.S.C. § 227(b)(3).

106. By placing artificial or prerecorded voice calls to Plaintiff's and the putative class members' cell phone numbers, GWIC violated the TCPA, including, but not limited to, 47 U.S.C. § 227(b) and the TCPA's corresponding regulations.

107. GWIC or those acting on its behalf willfully violated the TCPA when placing prerecorded voice calls to Plaintiff and the putative class members' cell phones.

108. Plaintiff and the putative class members are entitled to damages of up to $500.00 per violation for each call made by GWIC or those acting on its behalf that the Court finds violates the TCPA and up to $1,500.00 per violation if the Court finds that GWIC or those acting on its behalf willfully violated the TCPA.

**PRAYER FOR RELIEF**

WHEREFORE Plaintiff Jerry Baldridge, individually, and on behalf of all others similarly situated, request that the Court:

a. Enter an order pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3), certifying the proposed classes, appointing Plaintiff as the class representative, and appointing Plaintiff's counsel as class counsel;

b. Enter judgment in favor of Plaintiff and the Prerecorded Voice Class members for all damages and other relief available under the TCPA, 47 U.S.C. § 227(b), including injunctive relief, statutory damages of $500 per violation, and up to $1,500 per violation if Defendant willfully violated the TCPA;

c. Enter a judgment in favor of Plaintiff and the Class that enjoins Defendant from violating the TCPA's provisions and regulations;

d. Enter judgment in favor of Plaintiff and the Class for all applicable pre-judgment and post-judgment interest amounts;

e. Enter judgment in favor of Plaintiff and the Class for all costs; and,

f. Award Plaintiff and the Class such further and other relief the Court deems just and appropriate.

**Count II - Violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(c) *et seq.* (National DNC List Violations)**

109. Plaintiff incorporates by reference the allegations of the previous paragraphs as if fully stated in this Count.

110. The TCPA provides that is a violation of the law for a person whose phone number is registered on the National Do Not Call Registry to receive more than one call on their phone "within any 12-month period by or on behalf of the same entity." *See* 47 U.S.C. §§ 227(c)(1), (c)(5); 47 C.F.R. § 64.1200(c)(ii).

111. The penalty for each call placed in violation of the TCPA's restrictions on calling phone numbers registered on the DNC List is up to $500 per call and up to $1,500 per call if the

violation is determined to be willful. *See* 47 U.S.C. § 227(c)(5).

112. In addition, the TCPA allows the Court to enjoin GWIC's violations of the TCPA's regulations prohibiting calls to phone numbers registered on the National Do-Not-Call Registry. *See* 47 U.S.C. §§ 227(c)(5)(A).

113. By making calls to Plaintiff and the putative class members' phone numbers, which were registered on the DNC List, GWIC violated the TCPA, including, but not limited to, 47 U.S.C. §§ 227(c)(1) and the TCPA's corresponding regulations.

114. GWIC or those acting on its behalf knew or should have known that Plaintiff's and the putative class members' phone numbers were registered on the DNC List.

115. GWIC or those acting on its behalf willfully violated the TCPA when placing the calls to Plaintiff's and the putative class members' cell phones.

116. Plaintiff and the putative class members are entitled to damages of up to $500.00 per violation for each call made by GWIC or those acting on its behalf that the Court finds violates the TCPA and up to $1,500.00 per violation if the Court finds that GWIC or those acting on its behalf willfully violated the TCPA.

**PRAYER FOR RELIEF**

WHEREFORE Plaintiff Jerry Baldridge, individually, and on behalf of all others similarly situated, request that the Court:

a. Enter an order pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3), certifying the proposed classes, appointing Plaintiff as the class representatives, and appointing Plaintiff's counsel as class counsel;

b. Enter judgment in favor of Plaintiff and the DNC List Class members for all damages and other relief available under the TCPA, 47 U.S.C. § 227(c), including injunctive relief,

statutory damages of $500 per violation, and up to $1,500 per violation if Defendant willfully violated the TCPA;

c. Enter a judgment in favor of Plaintiff and the Class that enjoins Defendant from violating the TCPA's provisions and regulations;

d. Enter judgment in favor of Plaintiff and the Class for all applicable pre-judgment and post-judgment interest amounts;

e. Enter judgment in favor of Plaintiff and the Class for all costs; and,

f. Award Plaintiff and the Class members such further and other relief the Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Please take notice that Plaintiff demands a jury trial.

Dated: November 15, 2023

KIMMEL & SILVERMAN, P.C.

*/s/ Jacob U. Ginsburg*
Jacob U. Ginsburg Fed. No. 3568914
30 East Butler Avenue
Ambler, PA 19002
Telephone: (267) 468-5374
Fax: (877) 788-2864
jginsburg@creditlaw.com

BUTSCH ROBERTS & ASSOCIATES LLC

*/s/Christopher E. Roberts*
Christopher E. Roberts Fed. No. 3708019
231 S. Bemiston Avenue, Suite 260
Clayton, Missouri 63105
Telephone: (314) 863-5700
CRoberts@butschroberts.com

*Attorneys for Plaintiff*